968 N.E.2d 775 (2012)
360 Ill. Dec. 282
Donald EDMONDS, Appellant,
v.
ILLINOIS WORKERS' COMPENSATION COMMISSION et al. (Consolidation Coal Company, Appellee).
No. 5-11-0118WC.
Appellate Court of Illinois, Fifth District.
April 30, 2012.
*776 Bruce R. Wissore, Culley & Wissore, Harrisburg, for appellant.
Cheryl L. Intravaia, Feirich Mager Green Ryan, Carbondale, for appellee.

OPINION
Justice HUDSON delivered the judgment of the court, with opinion.
¶ 1 Claimant, Donald Edmonds, had been employed as a coal miner for almost 30 years when he retired on June 30, 1999. On December 31, 2003, claimant filed an application for adjustment of claim pursuant to the Workers' Occupational Diseases Act (Act) (820 ILCS 310/1 et seq. (West 2002)) seeking benefits from respondent, Consolidation Coal Company. In his application, claimant alleged that as a result of inhaling coal mine dust, he experiences shortness of breath and exercise intolerance. *777 Following a hearing, the arbitrator concluded that claimant suffers from coal workers' pneumoconiosis (CWP), that he established his disablement within two years after the date of last exposure to the hazards of the disease (see 820 ILCS 310/1(f) (West 2002)), and that respondent failed to demonstrate that the timing of the notice of the claim caused undue prejudice (see 820 ILCS 310/6(c) (West 2002)). The arbitrator awarded claimant permanent partial disability (PPD) benefits of $465.67 per week for 50 weeks, representing 10% of the person as a whole (see 820 ILCS 305/8(d)(2) (West 2002); 820 ILCS 310/7 (West 2002)). The Illinois Workers' Compensation Commission (Commission) affirmed and adopted the decision of the arbitrator. On judicial review, the circuit court of Franklin County set aside the decision of the Commission. The court found that the doctrine of collateral estoppel precluded any finding that claimant had CWP within two years after his last date of exposure because the United States Department of Labor had found to the contrary in a proceeding for benefits under the Black Lung Benefits Act (30 U.S.C. § 901 et seq. (2000)). We reverse the judgment of the trial court and reinstate the decision of the Commission.

¶ 2 I. BACKGROUND
¶ 3 Claimant was born on April 18, 1943, and was 64 years old on January 10, 2008, the date of the arbitration hearing. Claimant began working as a coal miner in 1969. During his career, claimant worked predominantly underground and held various job classifications, including shuttle car operator, repairman, and maintenance foreman. Prior to his retirement on June 30, 1999, claimant was working as a long-wall coordinator. Claimant testified that he retired because he had his "time in" and he wanted to have "a few years of quality life when [he] retired." Claimant also testified that he wanted to "get away from the mines and away from the dust" because, during his last five years of employment, he began experiencing shortness of breath. Claimant testified that since retiring, his breathing problems have worsened and he did not feel that he was physically capable of performing his past mining jobs. Claimant acknowledged that he smoked about a half a pack of cigarettes per day from the time he was a teenager until the age of 45. On cross-examination, claimant stated that he did not inform respondent that he was retiring because of a medical condition. He also acknowledged that none of his treating physicians ever diagnosed him with CWP, advised him to leave the mine, or restricted him from any employment due to a pulmonary condition.
¶ 4 Admitted into evidence were records of claimant's medical care from various treaters for the period from June 30, 1998, through February 8, 2007. Among these records was a referral to Dr. M. Haseeb for a cardiac consultation on August 1, 2001. At that time, claimant reported "staying quite active" since retiring from coal mining. Claimant stated that he swam on almost a daily basis for 30 minutes a day and took care of his yard with a push mower. Dr. Haseeb noted that claimant had no problems carrying out these activities "and in particular does not give any history of exertional chest discomfort, shortness of breath, etc." Claimant also told Dr. Haseeb that "he can walk as long as he wants to and does not really get any exertional shortness of breath or any chest pain." Claimant's wife told Dr. Haseeb that during a visit to an amusement park on July 21, 2001, the family could not keep up with claimant because he would keep going from one attraction to another. However, claimant told Dr. Haseeb that he "did not have good intake" *778 that day and passed out for a few seconds. In addition, claimant told Dr. Haseeb that he is overweight and that he gets short of breath while climbing stairs. Dr. Haseeb opined that claimant's symptoms of shortness of breath "are probably related to him being overweight and perhaps [an] underlying diastolic dysfunction," but added that claimant's "history of working in the coal mines may be contributing and he may have pneumoconiosis." A stress test performed on August 16, 2001, indicated exertional shortness of breath. However, at a follow-up, claimant denied experiencing any shortness of breath since the stress test. In addition, claimant denied a history of shortness of breath at examinations in April 2001, May 2001, March 2002, May 2002, October 2002, September 2003, October 2003, November 2003, December 2003, April 2004, July 2005, November 2005, February 2006, and July 2006.
¶ 5 On April 16, 2002, claimant, unrepresented by an attorney, applied for benefits under the federal Black Lung Benefits Act (30 U.S.C. § 901 et seq. (2000)). In conjunction with his application, claimant was referred to Dr. Parviz Sanjabi for an evaluation of his lungs. Dr. Sanjabi examined claimant on June 18, 2002. Claimant provided Dr. Sanjabi with a history of cough and sputum in the morning with an onset more than three years earlier. Claimant also reported dyspnea upon exertion after climbing one or two flights of stairs, but stated that he does not experience dyspnea when walking. As part of the evaluation, claimant underwent a chest X ray on June 17, 2002, and a pulmonary function study. Dr. Sanjabi interpreted the X ray as showing some granulomas in the left mid-lung field and para hilar and supra hilar areas on the right side. The pulmonary function study was normal. Dr. Sanjabi diagnosed CWP and bronchitis by history. Dr. Sanjabi attributed the diagnoses to smoking and exposure to coal but did not expect any impairment. Dr. Gatla, a radiologist and B-reader, also read the chest X ray taken on June 17, 2002, and interpreted it as negative. Dr. Gatla did not grade the quality of the film.
¶ 6 On August 20, 2002, a claims examiner for the United States Department of Labor (Department) issued a "Schedule for the Submission of Additional Evidence" (Schedule) and a "Summary of Employment Evidence." The Department determined that respondent would be the "responsible operator" liable for the payment of benefits. However, based on a review of the medical evidence presented, the Department concluded that claimant would not be entitled to benefits if it were to issue a decision at that time. The Department noted that in order to qualify for federal black lung benefits, the claimant must prove that: (1) he worked as a coal miner; (2) he has CWP; (3) his CWP was caused at least in part by exposure to coal mine dust; (4) he has a totally disabling respiratory or pulmonary impairment; and (5) his totally disabling impairment is caused at least in part by CWP. The Department found, inter alia, that claimant failed to establish that he had CWP or that he had a totally disabling respiratory or pulmonary impairment. The Department noted that the chest X ray dated June 17, 2002, was negative for black lung disease and that claimant's pulmonary function study was normal. Further, while Dr. Sanjabi diagnosed CWP, the Department found that he "gave no medical rationale for this diagnosis," and he did not expect any breathing impairment. As such, the Department concluded that the medical evidence was insufficient to establish the presence of CWP.
¶ 7 The Schedule additionally provided:
"The claimant and the designated responsible operator listed above may now *779 submit to this office additional medical evidence as to the claimant's entitlement. 20 C.F.R. § 725.414(a). After that evidence is submitted, and we complete any additional processing that we believe may be necessary (which may include an informal conference if all parties are represented and the other requirements of 20 C.F.R. § 725.416 are met), we will issue a proposed decision and order awarding or denying benefits. Any party dissatisfied with that decision and order may request a hearing before the Office of Administrative Law Judges at that time."
The Schedule noted that if no party submits additional medical evidence on entitlement, a proposed decision and order would be based on the preliminary conclusions stated in the Schedule. There is no indication that either party presented additional medical evidence.
¶ 8 Although not included in the record on appeal, a proposed decision and order denying claimant benefits under the Black Lung Benefits Act was apparently issued on November 18, 2002. On November 25, 2002, a "district director" for the Department issued a revised proposed decision and order. The November 25, 2002, decision states that the earlier proposed decision was revised because a quality reading of claimant's June 17, 2002, chest X ray by Dr. Dominic Gaziano, a B-reader, was not included on the list of medical evidence attached to the November 18, 2002, decision. Dr. Gaziano opined that the June 17, 2002, film was of "acceptable quality." The district director's review of Dr. Gaziano's quality reading "d[id] not demonstrate any basis for revision of the proposed decision and order issued on November 18, 2002." The revised proposed decision and order advised claimant that, within 30 days after the date of its issuance, "any party may file a written request for a formal hearing before the Office of Administrative Law Judges." The revised proposed decision and order further stated that if no response is received within 30 days, "th[e] Revised Proposed Decision and Order shall become final." Claimant did not respond to the revised proposed decision and order.
¶ 9 Meanwhile, claimant underwent a chest X ray on October 7, 2003. That film was read by Dr. Michael Alexander, a certified B-reader. On a scale of one to four, Dr. Alexander rated the quality of the film as one (good). He noted small round opacities present bilaterally, consistent with pneumoconiosis, category p/p, 1/1. Dr. Alexander also interpreted the film taken on June 17, 2002. He rated the quality of that film as one and noted small round opacities present bilaterally, consistent with pneumoconiosis category p/q, 1/1.
¶ 10 Dr. William Houser is a pulmonary specialist who has headed a black lung clinic since 1979. Dr. Houser examined claimant on May 17, 2004, at the request of claimant's attorney, and testified by deposition of his findings. At the time of Dr. Houser's examination, claimant complained of shortness of breath after walking about three blocks. Claimant reported a slight wheeze, but no cough, sputum production, hemoptysis (coughing up blood), or chest pain. Dr. Houser noted that claimant quit a 27-year smoking habit at age 45.
¶ 11 Dr. Houser testified that claimant's chest examination and pulmonary-function testing were normal. However, he stated that a person does not have to have an abnormal chest examination or pulmonary function to be diagnosed with CWP. Dr. Houser explained that normal test results do not necessarily exclude lung damage because there are limits to what pulmonary-function testing can detect and measure. He also noted that since the "range of normal" for lung function is between *780 80% and 120%, a person can lose one-third of his lung function and still be within the normal range. Thus, Dr. Houser related, an individual with "simple" CWP may be asymptomatic, but where there are symptoms, shortness of breath is the primary one.
¶ 12 Dr. Houser reviewed the chest X ray taken of claimant on October 7, 2003. Dr. Houser noted p-type opacities in the right mid- and both lower-lung zones. He noted that Dr. Alexander made similar findings. Based on claimant's 30-year history of coal mining and the chest X ray, Dr. Houser diagnosed claimant with CWP, category one. Dr. Houser opined that the cause of claimant's condition was his exposure to coal and rock dust during his employment as a coal miner. Dr. Houser added that there is no cause of CWP other than exposure to coal dust, that CWP is "a chronic, slowly progressive disease," and that it has no cure. Dr. Houser felt that any additional exposure would increase the likelihood of progression of the disease process. As such, Dr. Houser recommended that claimant avoid any additional exposure to coal and rock dust. Dr. Houser believed that claimant had CWP when he left mining. He estimated the statistical probability of claimant developing CWP after leaving mining at less than 1%. Dr. Houser also testified that while smoking can cause various types of pulmonary problems, claimant did not have any of the pulmonary function changes normally attributed to smoking. As a result, he was unable to "implicate" smoking as a cause of claimant's condition.
¶ 13 On cross-examination, Dr. Houser testified that he reviewed Dr. Sanjabi's report. Dr. Houser testified that neither wheezing nor sputum production, symptoms reported by claimant to Dr. Sanjabi, is diagnostic of CWP. Dr. Houser also testified that shortness of breath is a "subjective sensation" which is not diagnostic of any pulmonary disease process. In fact, he acknowledged that many conditions that can cause shortness of breath, including obesity, are not pulmonary in nature. Moreover, he acknowledged that the mere presence of coal dust on the lung does not mean that an individual will develop an occupational lung disease.
¶ 14 On February 1, 2007, Dr. Christopher Meyer, a B-reader, interpreted claimant's chest X ray of October 7, 2003. Dr. Meyer rated the quality of the film as two (acceptable with no technical defect likely to impair classification) and found no radiographic evidence of CWP.
¶ 15 At respondent's request, Dr. Peter Tuteur, a board-certified pulmonologist, reviewed claimant's medical records and examined claimant on April 18, 2007. Dr. Tuteur testified that his only significant physical finding upon examination was that of "obese physiognomy associated with a 298-pound weight superimposed on [a] height of 5 feet 11 inches." Dr. Tuteur explained that individuals who are obese, just by virtue of the added work of carrying that weight, will have "what may be perceived as exercise intolerance." As part of his examination, Dr. Tuteur had claimant undergo chest radiographs, a CT scan of the thorax, and complete pulmonary-function testing, which included arterial blood gas and spirometry testing. Dr. Tuteur did not find evidence of CWP on the April 18, 2007, chest X ray taken at his request. He testified that the CT scan revealed "a few nodules consistent with old healed granulomatous disease, and no evidence of an interstitial pulmonary process." In addition, Dr. Tuteur noted that the consulting radiologists diagnosed fibrosis and indeterminate pulmonary nodules, but not CWP. Dr. Tuteur testified that although claimant declined to have his arterial blood gas level measured during exercise, *781 it was normal at rest. In addition, claimant's spirometry was within normal limits. Based on his examination, Dr. Tuteur found no evidence that claimant experienced loss of lung function due to coal mining. Dr. Tuteur further concluded that claimant does not have CWP, cor pulmonale, massive pulmonary fibrosis, or any measurable impairment caused by his history of exposure to coal dust. Dr. Tuteur also opined that claimant did not have any condition that would prohibit him from coal mining. Dr. Tuteur acknowledged that the amount of time claimant worked as a miner was sufficient for CWP to develop radiographically. He noted, however, that not all coal workers develop the disease. Moreover, he considered claimant's smoking history "significant" given its "duration and * * * intensity."
¶ 16 On cross-examination, Dr. Tuteur stated that it is possible that one could have radiographically significant CWP but still have normal pulmonary-function testing, a normal chest examination, and no symptoms. Moreover, he acknowledged that the "quintessential clinical feature" of those who have CWP symptoms is exercise intolerance and breathlessness. He added that an individual with simple CWP, category 1/0, would likely not experience any symptoms that would cause him to complain to a physician.
¶ 17 The arbitrator found that claimant "suffered a timely disablement, based on the timely presence of disease on x ray and the extreme likelihood that it would have been present when [claimant] ceased mining." See 820 ILCS 310/1(f) (West 2002). The arbitrator also concluded that respondent failed to demonstrate that the timing of the notice of this claim caused undue prejudice. See 820 ILCS 310/6(c) (West 2002). The arbitrator awarded claimant permanent partial disability (PPD) benefits of $465.67 per week for 50 weeks, representing 10% of the person as a whole (see 820 ILCS 305/8(d)(2) (West 2002); 820 ILCS 310/7 (West 2002)). The Commission affirmed and adopted the decision of the arbitrator, with one commissioner specially concurring and one commissioner dissenting.[1] The dissenting commissioner concluded that claimant failed to prove that he contracted CWP within two years of the last day after he was exposed to conditions that could bring about the disease (see 820 ILCS 310/1(f) (West 2002)). The circuit court of Franklin County vacated the decision of the Commission. Citing the November 25, 2002, finding of the Department, the court found that the doctrine of collateral estoppel "precludes any finding that [claimant] had coal workers' pneumoconiosis within two years of his last date of exposure, June 30, 1999." As a result, the court concluded that the Commission's finding that claimant proved disablement within two years of his last exposure is against the manifest weight of the evidence and contrary to law. The court vacated the decision of the Commission and remanded the matter for the Commission "to enter a decision consistent with [its] findings." This appeal followed.

¶ 18 II. ANALYSIS
¶ 19 On appeal, claimant argues that the trial court's collateral estoppel finding was legally erroneous. Prior to *782 addressing claimant's argument, however, we note that a potential jurisdictional issue exists. As a general matter, when the trial court reverses the decision of an administrative agency and remands the matter to the agency for further proceedings, the trial court's order is not final for purposes of appeal. Williams v. Industrial Comm'n, 336 Ill.App.3d 513, 516, 271 Ill. Dec. 178, 784 N.E.2d 396 (2003). However, if, on remand, the agency has only to act in accordance with the directions of the court and conduct proceedings on uncontroverted incidental matters or merely make a mathematical calculation, then the order is final for purposes of appeal. Williams, 336 Ill.App.3d at 516, 271 Ill. Dec. 178, 784 N.E.2d 396. In this case, the trial court vacated the decision of the Commission and remanded the matter to the Commission "to enter a decision consistent with [the trial court's] findings." Under these circumstances, we find that the trial court's order was final for purposes of appeal as the Commission has only to act in accordance with the directions of the court and conduct proceedings on uncontroverted incidental matters. Accordingly, we turn to the merits of the appeal.
¶ 20 Section 1(f) of the Act (820 ILCS 310/1(f) (West 2002)) provides in relevant part that "[n]o compensation shall be payable for or on account of any occupational disease unless disablement * * * occurs within two years after the last day of the last exposure to the hazards of the disease." At issue in this case is whether the Department's November 25, 2002, decision denying claimant benefits under the federal Black Lung Benefits Act precludes claimant from establishing timely disablement under section 1(f) of the Act (820 ILCS 310/1(f) (West 2002)). The applicability of collateral estoppel is a question of law subject to de novo review. Allianz Insurance Co. v. Guidant Corp., 387 Ill. App.3d 1008, 1022, 326 Ill.Dec. 971, 900 N.E.2d 1218 (2008). Collateral estoppel applies when a party participates in two separate and consecutive cases arising out of different causes of action and some controlling factor or question material to both cases has been fully and completely resolved by a court of competent jurisdiction against a party in the former suit. Kim v. St. Elizabeth's Hospital of the Hospital Sisters of the Third Order of St. Francis, 395 Ill.App.3d 1086, 1092-93, 335 Ill.Dec. 172, 918 N.E.2d 256 (2009). The doctrine prohibits relitigation in the later proceeding of an issue actually decided in the earlier proceeding. McCulla v. Industrial Comm'n, 232 Ill.App.3d 517, 520, 173 Ill. Dec. 901, 597 N.E.2d 875 (1992).
¶ 21 For collateral estoppel to apply, three threshold requirements must be established: (1) the issue decided in the prior adjudication must be identical to the issue in the current action; (2) the party against whom estoppel is asserted must have been a party or in privity with a party in the prior action; and (3) the prior adjudication must have resulted in a final judgment on the merits. Mabie v. Village of Schaumburg, 364 Ill.App.3d 756, 758, 301 Ill.Dec. 786, 847 N.E.2d 796 (2006). We note that collateral estoppel is an equitable doctrine. LaSalle Bank National Ass'n v. Village of Bull Valley, 355 Ill. App.3d 629, 636, 292 Ill.Dec. 308, 826 N.E.2d 449 (2005). As such, even where the threshold elements of collateral estoppel are satisfied, the doctrine will not be applied if an injustice would result. LaSalle Bank National Ass'n, 355 Ill.App.3d at 636, 292 Ill.Dec. 308, 826 N.E.2d 449. "[T]he party against whom the estoppel is asserted [must have] had a full and fair opportunity and an incentive to litigate the issue in the prior proceeding." LaSalle Bank National Ass'n, 355 Ill.App.3d at *783 636, 292 Ill.Dec. 308, 826 N.E.2d 449. As our supreme court explained, "There must have been the incentive and opportunity to litigate, so that a failure to litigate the issue is in fact a concession on that issue." Talarico v. Dunlap, 177 Ill.2d 185, 192, 226 Ill.Dec. 222, 685 N.E.2d 325 (1997).
¶ 22 In this case, we find an identity of issues. At issue in both the proceeding before the Department and this proceeding is whether claimant has CWP. We also find that the party against whom estoppel is asserted, in this case claimant, was a party to the claim before the Department. In addition, we have no doubt that the district director's decision was final. Regulations pertaining to the procedure for pursuing a claim under the Black Lung Benefits Act expressly provide that the failure to request a hearing before the Office of Administrative Law Judges within 30 days after the issuance of a proposed decision and order (or a revised proposed decision and order) renders the proposed decision and order final. 20 C.F.R. § 725.419 (2002). In this case, claimant concedes that he did not appeal the revised proposed decision and order issued on November 25, 2002. Thus, the district director's decision was final. A more difficult question is whether the district director's determination constituted an "adjudication" for purposes of collateral estoppel.
¶ 23 Claimant contends that the "quality of the proceedings * * * bears on the decision to apply collateral estoppel." He claims that for an administrative decision to have collateral estoppel effect, at the very least it must have been a quasi-judicial proceeding. He asserts that a quasi-judicial body has the power and obligation to: (1) exercise judgment and discretion; (2) hear and determine or ascertain facts and decide; (3) make binding orders and judgments; (4) affect the personal property rights of private persons; (5) examine witnesses, compel the attendance of witnesses, and hear the litigation of issues on a hearing; and (6) enforce decision or impose penalties. See Bushell v. Caterpillar, Inc., 291 Ill.App.3d 559, 562, 225 Ill.Dec. 623, 683 N.E.2d 1286 (1997). Claimant concedes that not all of these "powers" are necessary. See Bushell, 291 Ill.App.3d at 562, 225 Ill.Dec. 623, 683 N.E.2d 1286. Nevertheless, he contends that there are "not enough judicial proceeding attributes to warrant collateral estoppel application." He asserts that the district director did not "hear" facts, but reviewed documents. He also asserts that the district director cannot examine witnesses, compel their attendance, or hold a hearing; that the district director's order is not binding upon an administrative law judge (20 C.F.R. § 725.455(a) (2002)); and that any contemptuous behavior must be certified to a federal district court which then holds a hearing (20 C.F.R. § 725.351(c) (2002)). Claimant views the district director's role as investigative or administrative in nature rather than adjudicatory.
¶ 24 A review of the procedure for processing a claim under the Black Lung Benefits Act is helpful to our analysis. After a claim is received by the Department, a district director, where necessary, schedules the miner for a medical examination and testing. 20 C.F.R. §§ 725.405(b), 725.406 (2002). The district director may also, where appropriate, collect evidence necessary to establish the nature and duration of the miner's employment and all other matters relevant to the claim. 20 C.F.R. § 725.405(d) (2002). The district director also collects evidence regarding the miner's employment history and investigates whether any operator may be held liable for the payment of benefits as a "responsible operator." 20 C.F.R. *784 §§ 725.404(a), 725.407 (2002). After the district director completes the development of the medical evidence, he issues a schedule for the submission of additional evidence which contains, inter alia, a preliminary analysis of the medical evidence. 20 C.F.R. § 725.410 (2002).
¶ 25 Where the district director believes that the evidence fails to establish any necessary elements of entitlement, he advises the claimant that, unless additional evidence is submitted within the allotted time frame, a proposed decision and order denying the claim will issue. 20 C.F.R. § 725.410 (2002). The "responsible operator" may also submit medical evidence. 20 C.F.R. §§ 725.410, 725.414 (2002). However, the amount of medical evidence that the parties may submit is limited. 20 C.F.R. § 725.414 (2002). For instance, a claimant may submit no more than two chest X ray interpretations, no more than one report of each biopsy, the results of no more than two pulmonary function studies and two arterial blood gas studies, and no more than two medical reports containing a physician's assessment of the miner's respiratory or pulmonary condition. 20 C.F.R. § 725.414(a)(2)(i) (2002). In addition, a claimant may submit any record of his hospitalization for a respiratory or pulmonary or related disease, or medical treatment for a respiratory or pulmonary or related disease. 20 C.F.R. § 725.414(a)(4) (2002).
¶ 26 At the end of the period permitted for the submission of additional evidence, the district director reviews the claim on the basis of all of the evidence submitted. 20 C.F.R. § 725.415 (2002). Thereafter, the district director may schedule an "informal" conference, issue a proposed decision and order, or take such other action as he considers appropriate. 20 C.F.R. §§ 725.415, 725.416 (2002). An informal conference is appropriate "in any claim where it appears that such conference will assist in the voluntary resolution of any issue raised with respect to the claim." 20 C.F.R. § 725.416(a) (2002). The regulations further provide that the conference shall not be stenographically reported and sworn testimony shall not be taken. 20 C.F.R. § 725.416(a) (2002). The informal conference has been described as being "similar to pretrial conferences in civil actions." Wellmore Coal Corp. v. Stiltner, 81 F.3d 490, 496 n. 8 (4th Cir.1996). Within 20 days after the termination of all informal conference proceedings, or, if no informal conference is held, at the conclusion of the period permitted for the submission of evidence, the district director issues a proposed decision and order. 20 C.F.R. §§ 725.417(c), 725.418(a) (2002). Within 30 days after the date of issuance of a proposed decision and order, any party may request a hearing before an administrative law judge. 20 C.F.R. § 725.419 (2002).
¶ 27 Given the foregoing procedure, we agree with claimant's assessment that the district director's role is investigative or administrative in nature rather than adjudicatory. In the federal proceeding, the amount of medical evidence claimant could submit was restricted. Further, there was no formal hearing and the powers of the district director are clearly limited. For instance, the district director is authorized to "make determinations" with respect to claims under the Black Lung Benefits Act, conduct conferences and informal discovery proceedings, compel the production of documents by the issuance of subpoena, prepare documents for the signature of the parties, and issue appropriate orders. 20 C.F.R. § 725.351(a) (2002). However, unlike an administrative law judge, a district director is not expressly authorized to conduct formal hearings, administer oaths and examine witnesses, compel the appearance of witnesses by the issue of subpoenas, or *785 "issue decisions and orders" with respect to claims under the Black Lung Benefits Act. Compare 20 C.F.R. § 725.351(b) (2002) (listing powers of an administrative law judge), with 20 C.F.R. § 725.351(a) (2002) (listing powers of a district director). The informal nature at the initial stage of the federal proceeding, coupled with the constraints placed on the nature of evidence that a claimant can initially submit in support of a claim for federal benefits, leads us to conclude that the proceedings on claimant's request for benefits under the Black Lung Benefits Act did not constitute an "adjudication" for purposes of collateral estoppel. For the same reasons, we also find that collateral estoppel should not apply because claimant did not have an incentive to fully and fairly litigate his claim before the district director. See Talarico, 177 Ill.2d at 191, 226 Ill.Dec. 222, 685 N.E.2d 325. Accordingly, we reverse the judgment of the circuit court of Franklin County.
¶ 28 Claimant also argues that the Commission's remaining findings, which were not considered by the trial court, do not warrant reversal. However, in its brief, respondent expressly waived the issues of whether the Commission's findings of notice and disablement were against the manifest weight of the evidence. Accordingly, we do not address the propriety of these findings in this appeal.

¶ 29 III. CONCLUSION
¶ 30 For the reasons set forth above, the judgment of the circuit court of Franklin County is reversed. The decision of the Commission is reinstated.
¶ 31 Reversed; Commission decision reinstated.
Presiding Justice McCULLOUGH and Justices HOFFMAN, HOLDRIDGE, and STEWART concurred in the judgment and opinion.
NOTES
[1] The panel originally consisted of Commissioners Sherman, Rink, and Lamborn. A majority of the panel members reached a decision. However, before a formal written decision was signed and issued, Commissioner Rink left office. Commissioner DeMunno was substituted for Commissioner Rink. Commissioner DeMunno signed the decision in order that it may issue. See Zeigler v. Industrial Comm'n, 51 Ill.2d 137, 281 N.E.2d 342 (1972).